Clm

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

CARDIOCALL, INC.,

Plaintiff,

-against-

STEVEN SERLING and EKG
PROFESSIONALS, INC.,

Defendants.
-------------------------------------------------------------------X

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

CV 06-6128

(Wexler, J.)

APPEARANCES:

> LA REDDOLA, LESTER & ASSOCIATES, LLP
> BY: ROBERT J. LA REDDOLA, ESQ.
> Attorneys for Plaintiff
> 600 Old Country Road  Suite 224
> Garden City, New York 11530

> Steven A. Serling
> Defendant, pro se
> 43 Hillside Drive
> New Fairfield, CT 06812

WEXLER, District Judge

This is an action arising out of a business dispute between Plaintiff Cardiocall, Inc.

("Cardiocall" or the "Plaintiff Company") and Steven Serling ("Serling"), a former employee.

The action was commenced by way of an order to show cause. After granting of a temporary

restraining order (the "TRO"), this court held a non-jury trial, consolidating the preliminary

injunction hearing with trial on the merits. The parties have submitted proposed findings of fact,

conclusions of law and legal memoranda. The court has considered those submissions and this

constitutes the Court's findings of fact and conclusions of law.

1

## PRIOR PROCEEDINGS

A.    The Complaint

Cardiocall commenced this action naming as Defendants Serling and his company, EKG, Professionals, LLC. ("EKG Pro"). The Defendant company defaulted and the only Defendant remaining is Serling. The complaint is based upon this court's diversity jurisdiction and sets forth six state law causes of action. Three of those causes of action: (1) misappropriation of trade secrets and confidential customer information; (2) unfair competition and (3) breach of fiduciary duty, have overlapping elements and rely on the same facts. Those three will be decided together. The three other causes of action to be decided separately are: (1) conversion; (2) interference with existing contractual relations and (3) interference with prospective business relationships.

B.    The TRO

Following oral argument on Plaintiff's request for preliminary relief, the court entered a TRO enjoining Defendants from:

(1)    using Cardiocall's computer equipment, including the computer keys and licenses for Cardiocall's biomedical systems computer program with the two software upgrades and two software keys;

(2)    soliciting Cardiocall's customers, and

(3)    using the download program developed by MSCRIPT specifically for Cardiocall to download Holter monitor data.

The TRO has remained in effect pursuant to the agreement of the parties, pending the court's decision on the merits. The court's findings and final order replaces the terms of the TRO.

# FINDINGS OF FACT

A. The Parties

1. Cardiocall is a New York corporation with its principal place of business in the Eastern District of New York. Cardiocall began doing business in 1994.

2. Debra Anzalone ("Anzalone") is the president of Cardiocall. Anzalone is a nurse who, at relevant times, was employed at Good Samaritan Medical Center in the coronary care unit.

3. Anzalone created the business of Cardiocall.

4. Defendant Steven Serling is an individual who was employed by Cardiocall from November 3, 2003 through September 29, 2006.

5. EKG Pro is a now defunct corporation created and run by Serling. Serling has agreed to the taking of a default judgment against EKG Pro and that company did not appear at trial.

B. The Holter Monitoring Business

6. Holter monitors are portable devices that record cardiac activity on a cassette. Physicians prescribe holter monitors to be worn by patients whose cardiac activity is monitored by this device over a period of time.

7. Since 2002, Cardiocall has been in the business of reading and transcribing data recorded by holter monitors to the prescribing physicians.

8. Anzalone developed the business of Cardiocall when she was employed as a nurse in the coronary care unit at Good Samaritan Hospital. Anzalone developed initial business contacts for Cardiocall as a result of her acquaintance with cardiac physicians in this unit.

9. With the exception of a single group of cardiologists, the business of which is not at issue here, Cardiocall does not have written contracts with physicians for the provision of its services. Instead, Cardiocall performs services as requested by physicians.

C. Programs for Uploading and Downloading Holter Monitor Information

10. Testimony at trial described the computer programs used in the holter monitoring business. These programs facilitate the uploading of information from the holter monitor cassette to the internet. That information is transmitted to companies like Cardiocall that download the information so that it can be transcribed and put in the form of a report that is provided to the physician.

I. Upload: The Mscript Program

11. The program used by Cardiocall to upload the information recorded by the holter monitor to the internet is called the "Mscript" program, a program developed by a company of the same name.

12. The Mscript program was developed for Cardiocall by Mark Golino ("Golino"), the founder and CEO of Mscript. Golino testified at trial.

13. Prior to working with Cardiocall, Golino's company developed a general system for uploading transcription files from an individual computer to the internet. That system involves plugging the recorder into a computer. The user clicks "upload" and the file is removed from the recording device. The user is given a tracking number and the file is encrypted and sent to be transcribed. This system is known as the company's "upload wizard."

4

14. In 2004, Golino's company was contacted by Cardiocall and asked to develop a customized system for uploading holter monitor information. Golino, through his company, customized his upload wizard for use by Cardiocall to work with holter monitors.

15. It took 37 hours for Golino's company to customize its upload wizard for use by Cardiocall. If Golino did not have the upload wizard technology in place, it would have taken approximately 90 days to develop the system for Cardiocall.

16. Cardiocall paid Golino a total of $3,515 for the Mscript software system.

17. The Mscript program is not subject to copyright protection.

18. Golino did not indicate that his company would, in any way, be prohibited from designing a holter monitor upload program for a Cardiocall competitor.

ii. Download: Biomedical Century 3000 Program

19. After information is uploaded to the internet, it must be downloaded by Cardiocall. Holter monitor information is downloaded by Cardiocall using a program called the "Biomedical Century 3000" software ("Century 3000"). This program was developed and is sold by a company known as Biomedical Systems.

20. Charles Martin ("Martin"), the Director of Sales for Cardiology Products for Biomedical Systems, testified at trial. The court makes the following findings based upon Martin's testimony.

21. The Century 3000 system is a holter analysis software program. The program analyzes each heartbeat recorded by the holter monitor and produces a report that allows a physician to determine whether there are any irregularities in a patient's heartbeat.

22. Cardiocall used the Century 3000 software to interpret the data that is uploaded to the internet by the Mscript program.

23. The Century 3000 software was acquired by Cardiocall in November of 2003. At that time, Cardiocall was in possession of version 1.5 of that software. This early version of the software was brought to Cardiocall by Serling, who purchased and used this version when operating a holter reading business known as "Cardialert."

24. In November of 2003, Cardiocall paid Biomedical Systems $7,850 for the purchase of software packages. Specifically, Cardiocall purchased an upgrade to version 1.5 (purchased and brought to Cardiocall by Serling). Cardiocall also purchased versions 2.02 and 2.03 of the Century 3000 software. This purchase resulted in the registration of the Century 3000 software in the name of Cardiocall.

25. To prevent theft of its proprietary software, Biomedical Systems utilizes a security key system. The operating disc containing the Century 3000 system does not work without the proper access key code. The access key codes are provided by Biomedical Systems to owners of its Century 3000 system to facilitate usage of the system.

26. Cardiocall is not the only entity with the right to purchase the Century 3000 system and upgrades from Biomedical Systems. Instead, the Century 3000 system is available for purchase by any company wishing to pay the price set by Biomedical Systems.

27. Biomedical Systems has no record of any software or keys being registered in the name of either Serling and/or EKG Pro.

D. Serling's Employment with Cardiocall

28. As noted above, prior to his employment with Cardiocall, Serling was engaged in the holter monitoring business through a company known as Cardialert. Serling owned a 50% interest in that company, the business of which ended in bankruptcy.

29. When conducting its holter monitoring services, Cardialert used version 1.5 of the Century 3000 software, a predecessor system to the versions of the system purchased by Cardiocall in November 2003.

30. In or around October of 2003, Serling contacted Anzalone and inquired as to whether Cardiocall had an opening for a digital holter scanner. Shortly thereafter, Serling began his employment with Cardiocall.

31. Serling never had any written employment agreement with Cardiocall. Instead, the parties' agreement was oral. The parties did not enter into any type of agreement, oral or written, not to compete in the event that Serling stopped working for Cardiocall. Thus, Serling was always free to leave Cardiocall at any time and was free to compete fairly with Cardiocall after leaving the company.

32. Serling brought to Cardiocall two holter monitoring clients, Drs. Verma and Schneider. When these clients were bought to Cardiocall, they became clients of Cardiocall. They were no longer clients of Serling or his former company.

33. Serling was employed by Cardiocall when the Mscript program was developed and worked with Golino's programmer during the development process.

34. When employed by Cardiocall, Serling spent the majority of his time working out of his Connecticut home. He rarely visited Cardiocall's Long Island headquarters.

7

35.  Serling testified that it was his understanding when joining Cardiocall, that at some time he would be brought in as a partner. The court finds that no such agreement ever existed.

36.  There came a time, prior to his leaving Cardiocall, when Serling entered into discussions with Anzalone as to the possible purchase of the business of Cardiocall from Anzalone.

37.  Those discussions never reached fruition and Serling never entered into an agreement to purchase the business of Cardiocall.

38.  In July of 2006, while still employed by Cardiocall, Serling formed the corporation known as EKG Pro.

39.  In August of 2005, Serling contacted Biomedical Systems to obtain a Century 3000 software update. Specifically, Serling requested an update to version 2.04 of the Century 3000 program.

40.  Serling's request was memorialized in a fax sent to Biomedical Systems that identified the sender as Cardialert (Serling's former company). Serling requested that the update be sent to him at his home address in Connecticut.

41.  Anzalone never authorized Serling's August 2005 request to Biomedical Systems. The court credits Anzalone's testimony that Cardiocall had no need for any updates, or new keys, at the time of Serling's request.

42.  Serling was the contact person at Cardiocall with whom Martin worked when handling Cardiocall's business with Biomedical Systems.

43.  Biomedical Systems sent version 2.04 and certain keys accompanying that version to Serling's Connecticut address.

8

44. The court finds that in August of 2005, Martin was under the impression that he was providing the updates to the Century 3000 software for Cardiocall and not for Serling's use in connection with a competing company.

45. On September 29, 2006, Anzalone terminated Serling from his employment with Cardiocall.

E. EKG Pro

46. After leaving Cardiocall, Serling began conducting a holter monitoring business under the EKG Pro name. He operated his new business from his home which was the same Connecticut address from which he worked for Cardiocall.

47. Through EKG Pro, Serling began performing holter reading services at the rate of $50 per reading. At the time, those services were being performed by Cardiocall at the rate of $65 per reading.

48. The court finds that certain readings performed by EKG Pro took place prior to the date when Serling left Cardiocall.

49. Former clients of Cardiocall that switched their business to EKG Pro were Dr. Laura Coudrey, Dr. Ajay Verma, Dr. Jonathan Lown, Dr. Alan Lefkin, Dr. Gulati and Rapid Portable X-Ray. These clients were under no contractual obligation to continue to use the services of Cardiocall.

50. Testifying at trial was Kenneth Coudrey ("Coudrey"), the husband and office manager for Dr. Laudra Coudrey.

51. The court finds that Serling was still employed by Cardiocall when he began to negotiate for EKG Pro to provide holter services for Dr. Coudrey.

52. It is important to maintain continuity in the provision of holter reading services. It would result in extreme hardship and a dangerous gap in service to patients if a cardiologist was ordered to immediately stop using a particular holter reading company without having a replacement service in place. It takes approximately three weeks to transition form one holter reading service to a different provider.

53. The transition by Coudrey and other former Cardiocall clients from using the services of Cardiocall to those of EKG Pro was seamless and appears to have resulted in no interruption in services to these clients.

54. When first setting up EKG Pro and for at least the first three months of its operation, Serling was using both the Mscript and Century 3000 computer systems purchased by and registered to Cardiocall.

F. Serling's Business After Entry of the TRO

55. After the November 21, 2006, granting of the TRO in this case, Serling informed the clients of EKG Pro that because of the high cost of legal representation, he was forced to close EKG Pro, but would continue performing the same services for EKG Pro clients under his own name. He informed his clients that the pending lawsuit would not interfere with his holter reading services and requested that all payments be made in the name of Steven A. Serling and not to EKG Pro.

56. After entry of the TRO, Serling engaged the services of a computer expert to develop holter monitor software to be used by Serling in his own business.

57. Serling paid his computer programmer $3,569 to develop his download program.

58. Serling's computer programmer "reverse engineered" the Mscript program to develop a holter program for Serling.

G.   Golino's Expert Opinion

59.   After commencement of this litigation, Golino inspected the computers of physicians who were clients of Cardiocall but had switched to using the services of EKG Pro. Among those computers inspected were computers located at Rapid Portable X-Ray and the computer of Dr. Laura Coudrey.

60.   Golino testified that the program being used by EKG Pro was, with minor cosmetic differences, the Mscript program that his company developed for Cardiocall. The only differences were certain modifications on the front end to reflect the EKG Pro logo instead of the Cardiocall logo. These were differences in the graphical user interfaces ("GUI's") used by EKG Pro. Based upon his inspection, Golino concluded that the Mscript upload program was the basis for the program being used by EKG Pro.

61.   The court finds that the Mscript program was the basis for the holter reading services program that is continued to be used by Serling. The court further finds that Serling's computer programmer used the Mscript program, purchased by Cardiocall, to develop the program used by Serling.

H.   Damages Testimony

62.   Anzalone testified as to the monthly revenue attributable to holter monitoring services provided to clients who left Cardiocall for Sterling and EKG Pro.

63.   Anzalone testified as to losing between $4500 and $5000 per month for Cardiocall's services to Dr. Coudrey. Anzalone further testified as to the loss of $500 per month attributable to Rapid Portable X-Ray. Monthly losses of $350 per month and $500 were testified as to being lost with respect to Drs. Lown and

Verma. The losses attributable to the business of Drs. Lefkin and Gulati were stated to be between approximately $400-$450 per month and $150 and $200 per month, respectively.

64.     Anzalone also testified as to equipment owned by Cardiocall that remained in the possession of Serling. Specifically, Anzalone testified that Serling was in possession of two laptop computers, a biomedical holter system, a VX 3 computer monitor, an external cassette deck and three holter monitors.

65.     Serling did not dispute that he was in possession of certain equipment owned by Cardiocall, but stated his intention and efforts to return that equipment.

66.     In addition to seeking money damages for lost business, Plaintiff seeks the return to Cardiocall of the keys used to operate the Century 3000 program. Plaintiff also seeks an order permitting Mark Golino to delete the program that Serling's computer programmer developed (that was based upon the Mscript program), from the computers of physicians who are now using Serling's services.

67.     Plaintiff seeks, through the return of the Century 3000 keys and the deletion of the Mscript-based program, to enjoin Serling completely from engaging in the holter monitoring business.

## CONCLUSIONS OF LAW

This is a diversity case alleging various violations of New York State law. Relevant standards of those laws and the court's holding as to each are outlined below.

A.    Misappropriation of Trade Secrets/Breach of Duty/Unfair Competition

    I.    Standards

    1.    A claim for misappropriation of trade secrets under New York law requires plaintiff to show: (1) that it possessed a trade secret and (2) that defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. B.U.S.A. Corp. v. Ecogloves, Inc., 2006 WL 3302841 *2 (S.D.N.Y. 2006).

    2.    A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it." Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 118 F.3d 955, 968 (2d Cir. 1997); see Scientific Components Corp. v. Sirenza Microdevices, Inc., 2006 WL 2524187 *23 (E.D.N.Y. 2006).

    3.    Factors to consider when determining whether information constitutes a trade secret are:

        (1)    The extent to which the information is known outside of the business;

        (2)    the extent to which it is known by employees and others involved in the business;

        (3)    the extent of measures taken by the business to guard the secrecy of the information;

        (4)    the value of the information to the business and its competitors;

        (5)    the amount of effort or money expended by the business in developing the information, and

(6)     the ease of difficulty with which the information could be properly

acquired or duplicated by others.

North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999); Scientific

Components, 2006 WL 2524187 *24..

4.     Customer lists may constitute trade secrets under certain limited circumstances.

Specifically, the identity of customers is protected if the list was developed

through substantial effort and kept in confidence. North Atlantic, 188 F.3d at 44.

On the other hand, lists of customers will not be deemed protected trade secret

information where customers are readily ascertainable "as prospective users of

consumers," of the product at issue. Leo Silfen, Inc. v. Cream, 29 N.Y.2d 387,

392 (1972); Metal & Salvage Assoc., Inc. v. Siegel, 503 N.Y.S.3d 200, 201-02

(1st Dep't. 1986).

5.     The issue of whether and to what extent a customer list constitutes trade secret

information is a question of fact for this court. When determining the

confidentiality of customer lists, the issue of whether or not the departing

employee has a casual recollection of the information is not dispositive. Instead,

the court considers the trade secret criteria referred to above.

6.     While "years of effort and advertising" weigh in favor of a finding that a customer

list is confidential, trade secret protection will not be afforded where there is no

advertising expense and customers can be found through a "publicly available

source or prior existing trade or social contacts." Metal & Salvage Assoc., 503

N.Y.S.3d at 201-02

7.  Once it is established that information sought to be protected is trade secret information, the court must determine whether the defendant used that information in breach of some duty.

8.  A duty can arise from the existence of an express written agreement or from the employment relationship itself. As to the latter, New York law imposes upon employees a duty of good faith and fair dealing. Westwood Chem. Co. v. Kulick, 570 F. Supp.2d 1032, 1036 (S.D.N.Y. 1983) see Leo Silfen, 328 N.Y.S.2d at 392. That duty is not dependent upon an express contractual relationship but exist even where the employment relationship is at will. Unisource Worldwide, Inc. v. Valenti, 196 F. Supp.2d 269, 280 (E.D.N.Y. 2001); Arnold's Ice Cream Co. v. Carlson, 330 F. Supp. 1185, 1187-88 (E.D.N.Y. 1971).

9.  The duty imposed by New York law includes the duty to refrain from the use of trade secret information to compete with a former employer. North Atlantic, 188 F.3d at 47; B.U.S.A. Corp., 2006 WL 3302841 * 6. Such a duty exists even in the absence of a written employment agreement and/or an express covenant not to compete. Id.

10. Where an employee misuses special knowledge gained in the employment relationship, the duty of good faith and fair dealing is breached. Westwood, 570 F. Supp.2d at 1036. See also Doubleclick, Inc. v. Henderson, 1997 WL 731413 *4 (N.Y. County 1997).

11. Additionally, this duty of good faith and fair dealing prohibits employees from soliciting their employer's customers or setting up a competing business while

still employed. <u>Unisource</u>, 196 F. Supp.2d at 280; <u>see also</u> <u>Iron Mountain Information Mgmt., Inc. v. Taddeo</u>, 2006 WL 1867049 (E.D.N.Y. 2007).

12.  While an employee is free to "compete with his former employer as to matters for which he has been employed . . . he is not free to exploit the same trade if the opportunity was facilitated by acts of preparation and disloyalty during his employment and before his termination and by the breach of his obligation to use his best efforts in the interest of his employer." <u>Freedom Calls Foundation v. Bukstel</u>, 2006 WL 845509 *17 (E.D.N.Y. 2006) (citations omitted).

13.  An employee's breach of his duty of good faith and fair dealing can also support a claim, under New York law, for unfair competition. Such a claim lies where an employee " misappropriates and exploits confidential information" belonging to his employer in breach of the relationship of trust. <u>Vision Specialty Food Prods., Inc. v. Ultimate Gourmet, LLC.</u>, 2001 WL 1506008 *5 (S.D.N.Y. 2001); <u>Doubleclick</u>, 1997 WL 731413 * 7.

ii.  <u>Holdings</u>

14.  Plaintiff's allegations in support of the misappropriation of trade secrets, breach of duty and unfair competition claims are based upon the argument that Serling unfairly used Cardiocall's customer list as well as the Mscript and Century 3000 software programs. Serling is alleged to have used this information to set up a business in competition with Cardiocall while still employed by the company.

15.  The first issue for the court to consider is whether the customer list or the computer programs constitute protected trade secret information.

16.     The court concludes that while the list of Cardiocall's customers is not protected as trade secret information under New York law, the computer programs do constitute information entitled to protection.

17.     As to customer lists, the court finds that the potential customers of Cardiocall's services, i.e., cardiologists within a given region, is a list that is readily ascertainable. While Cardiocall introduced evidence of having cultivated relationships with physicians in certain practices over time, there was no evidence as to the identity of particular contacts and the inability of others to identify contact individuals. Additionally, Cardiocall introduced no evidence that it took any measures to guard the secrecy of its customer list.

18.     As to the Mscript and Century 3000 computer programs, the court finds that these programs constitute protected trade secret information.

19.     Plaintiff established that the Mscript program was purchased for use by Cardiocall. It was further established that this program was designed specifically for use by Cardiocall in its holter reading business. While Serling aided somewhat in the development process, he did so in his capacity as an employee of Cardiocall. He cannot therefore claim any personal ownership interest in that program.

20.     Similarly, the Century 3000 software was purchased specifically for use by Cardiocall. Cardiocall endeavored to protect the Century 3000 software by the use of keys to access the information. Like the Mscript program, this program is not available for use by the general public.

21. It matters not that the Century 3000 software purchase was in the form of an update to the version brought to Cardiocall by Serling. That earlier version had become obsolete and the new program purchased by Cardiocall was registered in the Cardiocall name and became the property of that company. Neither Serling nor his former company retained any ownership interest in the Century 3000 software.

22. Having found that both the Mscript and Century 3000 programs constitute trade secret information, the next issue is whether Serling used these programs in breach of an agreement, confidential relationship or duty. The court holds that he did.

23. While it is undisputed that Serling had no employment agreement, the absence of an agreement does not allow Serling to act in contravention of his duties as an employee. As noted, former employees cannot use trade secrets in competition with a former employer.

24. Serling gained access to Cardiocall's computer programs only in his capacity as a Cardiocall employee. The evidence showed that Serling utilized both of these programs, while a Cardiocall employee, to set up his own competing business in the form of EKG Pro.

25. Serling was entitled to set up his own business in competition with Cardiocall. When doing so, however, he was required to do so without using Cardiocall's confidential information. Serling could have contacted companies like Mscript and Biomedical Systems and purchased his own software. Instead, the evidence is clear that Serling used the programs he had access to as an employee of Cardiocall

to set up his own competing business. This, he could not do – even in the absence of an agreement no to compete.

26. Serling's use of the "Cardialert" name on the fax cover sheet when ordering version 2.04 of the Century 3000 program is of no consequence under the circumstances here. It is clear that when Serling contacted Biomedical Systems in August 2005, that company was under the impression that Serling was acting on behalf of Cardiocall, and not preparing to leave that company to start his own competing business.

27. In light of the foregoing, the court holds that Serling is liable for misappropriation of trade secrets under New York law. The same facts support the court's holding that Serling breached his duties an a Cardiocall employee and engaged in unfair competition under New York law. Serling's use of Cardiocall's confidential computer information to set up a business in competition with Cardiocall – while still a Cardiocall employee, supports the court's holding as to each claim.

B. Tortious Interference With Contract

i. Standards

28. The elements of a tortious interference claim under New York law are: (1) existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the intentional procurement of a breach of the contract without justification; (4) actual breach of the contract and (4) damage to the plaintiff. Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001); Advanced Marketing Group, Inc. v. Business Payment Systems, LLC, 481 F. Supp.2d 319, 324 (S.D.N.Y. 2007).

ii.  Holding

29.  Cardiocall had no contract with any of the clients that switched their holter reading business from Cardiocall to Serling and/or EKG Pro.

30.  In light of the fact that no contract existed, none could have been breached and the court therefore dismisses any claim for tortious interference with contractual relations.

C.  Tortious Interference With Prospective Business Relationships

I.  Standards

31.  To prevail on a claim for tortious interference with prospective business relations a plaintiff must prove: (1) that there was a business relationship with a third party; (2) defendant's knowledge of and intentional interference with that relationship; (3) that defendant acted with malice or used wrongful means and (4) injury to the business relationship with the third party. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003); PKG Group, LLC v. Gamma Croma S.p.A., 446 F. Supp.2d 249, 251 (S.D.N.Y. 2006); Freedom Calls, 2006 WL 845509 *20.

32.  The nature of conduct necessary to support a finding of "wrongful means" was the question referred by the Court of Appeals for the Second Circuit to the New York Court of Appeals in the case of Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003).

33.  In response to the question certified, the Court of Appeals characterized "wrongful means" as conduct more culpable than that which would suffice to sustain a claim for tortious interference with existing contractual relations. Carvel Corp. v. Noonan, 785 N.Y.S.2d 182. Specifically, the Court of Appeals noted that

such conduct must amount to a crime or an independent tort. Id. at 363. Conduct amounting to economic pressure alone will not suffice to sustain a claim for wrongful interference with prospective business relations. Id.; PKG Group, 446 F. Supp.2d at 251 (allegation that defendant acted "solely out of malice" insufficient to state a claim).

34.    To sustain a claim plaintiff must prove some conduct directed at the party with whom the plaintiff has or seeks to have a business relationship; not merely conduct directed toward the plaintiff. Carvel, 785 N.Y.S.2d at 363; Intellisec v. Firecom, Inc., 2001 WL 218940 *7 (E.D.N.Y. 2001); Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y. 1997). Economic pressure, standing alone, will not generally state a claim for tortious interference with a prospective business relationship. Carvel. 785 N.Y.S.2d at 364. Consequently, the offering of goods or services at a less expensive price than that offered by plaintiff is insufficient to sustain the claim. Id.; see Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc., 2007 WL 764710 *2 (N.Y. County 2007).

35.    On the other hand, the knowing use of trade secret or other confidential information has been held to be the sort of tortious conduct necessary to state a claim. See, e.g., Volt Delta Resources LLC v. Soleo Comm., Inc., 816 N.Y.S.2d 702 (N.Y. County 2006) (denial of motion to dismiss claim for tortious interference with prospective business relations where plaintiff alleged inducement of prospective business partner to divulge confidential information);

<u>Fonar</u>, 957 F. Supp. at 483-84 (tortious interference claim sustained where defendant's conduct involved wrongful use of customer list and false pretenses).

ii.     <u>Holding</u>

36.     The court holds that Serling is liable for interference with the prospective business relationships between Plaintiff and the companies that were former Cardiocall clients who are now doing business with Serling.

37.     First, Plaintiff showed ongoing business relationships with the clients who switched their business to Serling. Second, it is clear that Serling knew of these relationships since he was the contact person who dealt with these clients when he was employed by Cardiocall.

38.     As to the level of wrongful conduct necessary to sustain this claim, the court holds that the means employed by Serling when interfering with the business relationships between Cardiocall and its clients were sufficiently wrongful to sustain the claim.

39.     Specifically, it was Serling's wrongful use of Plaintiff's upload and download programs, (held above to constitute misappropriation of trade secret information, unfair competition and breach of duty) that amounts to the independent tort and therefore the "wrongful conduct" necessary to state this claim.

40.     The court emphasizes that its holding does not rest on the fact that Serling offered holter reading services at a price lower than that offered by Cardiocall. Serling was free to compete fairly with Cardiocall upon his departure from the company. The means employed here to lure away potential future business from Cardiocall

were sufficiently wrongful, independent of the lower price, for Plaintiff to prevail on this claim.

41. Finally, Plaintiff has properly shown injury in the form of lost profits. The amount of profits to which Plaintiff is entitled is detailed below.

D. <u>Conversion</u>

    I. <u>Standards</u>

42. Under New York law, conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." <u>Vigilant Ins. Co. of Am. v. Housing Auth. of City of El Paso</u>, 87 N.Y. 36, 44 (1995); <u>see</u> <u>Fagan v. First Security Investments, Inc.</u>, 2006 WL 2671044 *3 (S.D.N.Y. 2006).

43. To prevail on a conversion claim, a plaintiff must point to a specific identifiable piece of property that has been wrongfully converted by the defendant. <u>Jacob v. Kimberly-Clark Corp.</u>, 2006 WL 1582149 *6 (E.D.N.Y. 2006); <u>Volt</u>, 816 N.Y.S.2d 702.

44. Additionally, plaintiff must show that a demand for the return of the property has been made and that defendant has refused such return. <u>McCalla v. SUNY Downstate Med. Center</u>, 2006 WL 1662635 *9 (E.D.N.Y. 2006); <u>Seanto v. United Arab Agencies</u>, 137 F. Supp.2d 445, 451 (S.D.N.Y. 2001).

    ii. <u>Holding</u>

45. Plaintiff made reference to certain items of personal property belonging to Cardiocall, for which demand for return was made.

46. Serling agreed that he had such items and stated that he has unsuccessfully attempted to return those items.

47. In light of the foregoing, the court orders the immediate return of Cardiocall's property to Anzalone. In light of Serling's testimony regarding such property, the court trusts that such return has already taken place. In the event that this property has not been returned within thirty days of the date of this order, Cardiocall may return to this court for further relief.

## DAMAGES

48. Plaintiff has prevailed on the claims for misappropriation of trade secrets, breach of duty an employee, unfair competition and tortious interference with prospective business relationships. Accordingly, the court must now assess the amount of damages to which Plaintiff is entitled.

49. The proper method for computing damages requires the court to determine the profits that Plaintiff would have realized, over a reasonable period of time in the absence of Serling's wrongful conduct. S&K Sales v. Nike, Inc., 816 F.2d 843, 851-52 (2d Cir. 1987); Westwood, 570 F. Supp.2d at 1037.

50. While Plaintiff seeks profits for a two year period of time, the court holds that a reasonable period of time to award lost profits is a three month period.

51. The court awards three months of lost profits because of the absence of an agreement not to compete and the evidence showing that three months is the period of time that it would have taken Serling to fairly start up a business competing with Cardiocall. Because Serling reaped three months worth of profits

as a result of his use of Cardiocall's confidential information and in breach of his duties as a Cardiocall employee, those profits must be turned over to Cardiocall.

52. The court awards Plaintiff lost profits in the amount of $20,100. This reflects the lose of three months of profits as follows:

53. $14,250 representing three months of profits (at the rate of $4750 per month) attributable to the business of Dr. Coudrey.

54. $1500 representing three months of profits (at the rate of $500 per month) attributable to the business of Rapid Portable X-Ray.

55. $3,825 representing three months of profits (at the rate of $425 per month each) attributable to the business of Drs. Lown, Verma and Lefkin.

56. $525 representing three months of profits (at the rate of $175 per month) attributable to the business of Dr. Gulati.

57. The court declines to enter an order requiring deletion of computer programs from physician offices that are now using Serling's services. This relief is denied for the following reasons. First, although the computer programs were purchased by Cardiocall, there was no evidence that such programs were unavailable for purchase by competitors. Thus, it is likely that Serling could have lawfully purchased programs allowing him to compete with Cardiocall. Although Serling breached his duties as a Cardiocall employee, that breach does not entitle Cardiocall to put Serling out of business forever.

58. Additionally, to the extent that either the Mscript or Century 3000 programs are protected by copyright, such copyrights have not been demonstrated to be owned

by Cardiocall and are not at issue here. If the owners of those copyrights chose in the future to state any claim against Serling, they are free to pursue those claims.

59. The court also declines to order deletion of the holter reading programs from physician offices because of the extreme hardship that such deletion would work on patients, as testified to by Kenneth Coudrey.

60. While the court declines to order deletion of the computer programs, the court has held that the programs were unlawfully taken from Cardiocall. Accordingly, the court will award damages to Cardiocall in the amount of $11,365 representing the amounts spend by Cardiocall for the purchase of the Mscript and Century 3000 software that was misappropriated by Serling.

## JUDGMENT

61. The court orders that judgment be entered in favor of Cardiocall on its claims for misappropriation of trade secrets, breach of duty, unfair competition and tortious interference with prospective business relationships. The claim for interference with existing contractual relations is dismissed with prejudice.

62. Damages are awarded to Cardiocall in the amount of $31,465.

63. As to the claim for conversion, Serling is ordered to immediately return any laptops, computer monitors or holter monitors belonging to Cardiocall that remain in his possession.

SO ORDERED.

LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
       June  18 , 2007

26